UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:14-cv-186-FDW

| | |
|---|---|
| DAMON DEMOND STAFFORD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| FNU MURRAY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the Court on initial review of Plaintiff's Complaint, filed under 42 U.S.C. § 1983, (Doc. No. 1). See 28 U.S.C. §§ 1915(e) and 1915A. Also pending before the Court is Plaintiff's Motion to Appoint Counsel, (Doc. No. 4). On December 10, 2014, the Court entered an order waiving the initial filing fee and directing monthly payments to be made from Plaintiff's prison account. (Doc. No. 5). Thus, Plaintiff is proceeding in forma pauperis.

**I.  BACKGROUND**

Pro se Plaintiff Damon Stafford, a North Carolina prisoner currently incarcerated at Scotland Correctional Institution, filed this action on November 17, 2014, pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendants violated his right not to be subjected to cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution based on alleged excessive force and deliberate indifference to serious medical needs while Plaintiff was incarcerated at Alexander Correctional Institution ("Alexander"). In his Complaint, Plaintiff names as Defendants (1) FNU Murray, identified as a segregation sergeant at Alexander; (2)

1

FNU Copeland, identified as a segregation correctional officer at Alexander; (3) FNU Quigley, identified as a transportation correctional officer at Alexander; (4) FNU Honeycutt, identified as a captain at Alexander; and (5) David Guinn, identified as a nurse practitioner at Alexander.

The following allegations by Plaintiff are taken as true for the purpose of this initial review:

> On 7-30-2014, around 1410, Plaintiff was found unresponsive on the floor of cell SC-3, by a c/o making their routine rounds through the segregation wing. A code blue distress announcement went out over the institution, to alert all available staff, medical, and custody to respond immediately. Plaintiff had been 7 days without eating in protest against his placement on administrative segregation pending a[n] investigation. After having vital signs checked by nurse practitioner Guinn, Plaintiff was given glucose tablets to raise his sugar level. Then a lengthy discussion ensued between Mr. Guinn and Captain Honeycutt. Afterward plaintiff was told by Mr. Guinn that he would be sent to the outside hospital by ambulance to receive I.V.s for severe dehydration and a[n] elevated blood pressure reading. Video footage was recorded of this from the time officials entered cell SC-3 until they exited with the fully restrained plaintiff in a wheelchair.
> Plaintiff was pushed from segregation to main medical, to transition to ambulance, by c/o Copeland with Sgt. Murray walking along side of the wheelchair. Copeland and Murray discussed their frustration with all the extra work they were having to do with the numerous prisoners who were on hunger strikes at the time, on the way to main medical. Murray told Copeland of his desire to start forcing feeding tubes down prisoner's throat, saying, "I bet that'll slow this shit down." Copeland laughed and said, "That's what's about to happen to this one" and stated he had witnessed a prisoner pull one of the feeding tubes out of his throat. Transportation c/o Quigley, who would be one of the two officers escorting plaintiff to the hospital, was waiting in main medical of Alexander, to change all the restraints from segregation to transportation's before the ambulance arrived.
> After switching handcuffs, shackles and the waist chain on Plaintiff, Quigley told plaintiff to turn his hands one over the other so the black box could be secured over the handcuffs and attached to the waistchain. Plaintiff told Quigley that wasn't policy and the black box could be placed over the handcuffs the normal way because he had just went out to the hospital that way on 7-26-14. At that time Murray stated, "Fuck this shit, twist his wrists" and grabbed plaintiff's left wrist as Quigley tossed the black box onto a nearby stretcher and grabbed his right wrist. Copeland, who was standing behind the wheelchair in which plaintiff sat in proceeded to choke plaintiff by grabbing him around the right side of the neck and applying pressure. Then Murray ordered, "Flip the

2

chair" and Copeland complied.

When fully restrained plaintiff hit floor [sic] Quigley dove on top of him with Murray following with his forearm driving into plaintiff's forehead which busted on impact with the floor. Murray further instructed Copeland to "spray his ass" while him and Quigley continued to roughly twist plaintiff's wrists, for no other reason than to hurt plaintiff, neither had the black box at this time.

Copeland sprayed a few bursts of OC pepper spray directly into plaintiff's face, once he stopped spraying, a moment later plaintiff felt something hard smash into the back of his head, behind the right ear. It's plaintiff's belief that Copeland struck him with the bottom of the spray canister. As other staff members arrived on the scene Murray shouted to them, "Go get the big can. We need the big can!", meaning the more concentrated canister of spray. At that time plaintiff cried out, "Okay please!" to stop them from hurting him any more. Quigley got off of plaintiff, retrieved the black box off the stretcher, and clamped them down over plaintiff's handcuffed wrists.

Capt. Honeycutt arrived as plaintiff was being lifted off the floor, and asked his subordinates if plaintiff had been in restraints at the time force was used. Upon hearing that plaintiff had been, Capt. Honeycutt stated, "Everyone here who was involved, go make a statement and make it good." Quigley told the captain that he was assigned as one of the officers who would be transporting plaintiff to the hospital and Honeycutt replied, "not any more." That's when E.M.S. personnel arrived in main medical, and Mr. Guinn conversed with them briefly, before conferring with Capt. Honeycutt for a minute. After the two of them conversed for a short time, Mr. Guinn told the E.M.S. workers that plaintiff wouldn't be going to the hospital now. A Sgt. Walker took a couple of pictures of plaintiff's busted and bleeding forehead. After the photos were taken, Capt. Honeycutt ordered two staff members to wheel plaintiff back to segregation without being reexamined for the condition Mr. Guinn had just deemed serious enough to be sent to the hospital for, nor was plaintiff examined for the injuries he got during the excessive force. Later after being decontaminated back in C-block wing of the segregation unit as plaintiff laid in bed a male nurse (unknown) stopped by cell SC-3 with 3 packs of ointment for plaintiff's forehead and advised plaintiff to fill out sick calls about any other problems.

Plaintiff suffered a busted forehead, numerous cuts and scarring around his wrists, throat problems that makes him have bouts that almost chokes him on a thick greenish colored phlegm, that has also been spotted with blood, and makes him cough continuously until these fits subsided. A constant intense ringing in the right ear. Since this incident plaintiff has submitted numerous sick calls that the nurses has referred me to see Mr. Guinn about, and I've only been able to get him to address the problem with the ringing of the ear. On 9-23-14, plaintiff was examined by Mr. Guinn about the ringing in his right ear. Mr. Guinn did nothing claiming nothing was wrong, although plaintiff clearly explained the symptoms of his ear problems. Then on 10-30-14, after being referred again to see Mr. Guinn, which the ringing had intensified to a worse condition, Mr. Guinn prescribed a 3-month prescription of Loratadine 10 milligram tablets for the problem. Plaintiff is

3

> still trying to be seen about his throat issues as of 11-4-14, although he has
> referred by the sick call nurses to see Mr. Guinn, he has refused to see plaintiff
> about his throat.

(Doc. No. 1 at 3-7). Plaintiff alleges that Defendants' conduct constituted cruel and unusual punishment in violation of Plaintiff's Eighth Amendment rights. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages. (Id. at 5).

## II. STANDARD OF REVIEW

Because Plaintiff is proceeding in forma pauperis, the Court must review the Complaint to determine whether it is subject to dismissal on the grounds that it is "frivolous or malicious [or] fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2). Furthermore, under § 1915A the Court must conduct an initial review and identify and dismiss the complaint, or any portion of the complaint, if it is frivolous, malicious, or fails to state a claim upon which relief may be granted; or seeks monetary relief from a defendant who is immune to such relief.

In its frivolity review, this Court must determine whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989). Furthermore, a pro se complaint must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his Complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

## III. DISCUSSION

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312, 319 (1986). To establish an Eighth Amendment claim,

4

an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). In adjudicating an excessive force claim, the Court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury inflicted, and, ultimately, whether the force was "applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." Albers, 475 U.S. at 320-21. Furthermore, the Supreme Court has recently reiterated that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 130 S.Ct. 1175, 1178-79 (2010). In Wilkins v. Gaddy, the Supreme Court observed:

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." The extent of injury may also provide some indication of the amount of force applied. As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.

Id. at 1178-79 (citations omitted).

In Farmer v. Brennan, the Supreme Court held that the Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" 511 U.S. 825, 832

(1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1992)). This is a low standard, as the Supreme Court emphasized that "[p]rison conditions may be restrictive and even harsh." Id. at 833 (internal quotations omitted). To sustain an Eighth Amendment claim, a prisoner must show (1) that the deprivation was objectively sufficiently serious—that is, the deprivation must be a "denial of the minimal civilized measure of life's necessities" and (2) that the defendant was deliberately indifferent to the prisoner's health or safety. Id. at 834 (internal quotations omitted). Thus, "[d]eliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001).

The Court finds that Plaintiff's Eighth Amendment claim against Defendants Quigley, Copeland, and Murray based on alleged excessive force survives initial review in that it is not clearly frivolous. The Court notes, however, that it does not appear that Plaintiff has exhausted his administrative remedies with regard to his claims of deliberate indifference to serious medical needs as to the remaining Defendants. Plaintiff's grievance, dated August 4, 2014, does not discuss alleged refusal to provide needed medical care by prison officials. See (Doc. No. 1-1). Rather, it describes the alleged incident of excessive force by Defendants Quigley, Copeland, and Murray. Moreover, prison officials' response to the grievance at Step Two noted the following in response to Plaintiff's grievance: "A code blue was called due to you being found unresponsive in your cell. At that time, you were assessed by medical and made the determination to send you to Main Medical for a closer observation. While in main medical, you refused staff orders. Therefore, force was used to gain compliance and disciplinary action was taken, which you were found guilty of. Due to force being used an investigation is being

6

completed at this time." (Doc. No. 1-1 at 4). At Step Three, a grievance examiner denied Plaintiff's appeal, stating that Plaintiff alleged in his grievance that "he was treated unfair and pepper-sprayed by staff when he was being placed in full restraints." (Id. at 5). The grievance examiner stated that there was no evidence to support Plaintiff's claim. The Court will grant Plaintiff 20 days in which to submit a statement to the Court addressing whether he filed any grievances specifically addressing the deliberate indifference claim he purports to raise in this action. Specially, Plaintiff shall address why his deliberate indifference claim should not be dismissed for failure to exhaust administrative remedies.

Finally, the Court addresses Plaintiff's motion to appoint counsel. In support of the motion, Plaintiff asserts that imprisonment will greatly limit his ability to litigate, he has limited knowledge of the law and no access to a law library, and that the issues are complex. There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to seek the assistance of a private attorney for a plaintiff who is unable to afford counsel. Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987). Notwithstanding Plaintiff's contentions to the contrary, Plaintiff has not shown exceptional circumstances justifying appointment of counsel at this time. Therefore, Plaintiff's motion to appoint counsel will be denied.

## IV. CONCLUSION

In sum, the Complaint survives initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A as to Plaintiff's excessive force claim against Defendants Quigley, Copeland, and Murray. The Court will grant Plaintiff 20 days in which to submit a statement to the Court in accordance with this Order.

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's Complaint, (Doc. No. 1), survives initial review as to Plaintiff's excessive force claim against Defendants. Quigley, Copeland, and Murray. The Court will grant Plaintiff 20 days in which to submit a statement to the Court addressing whether he filed any grievances specifically addressing the deliberate indifference claim he purports to raise in this action. Specially, Plaintiff shall address why his deliberate indifference claim should not be dismissed for failure to exhaust administrative remedies.

2. The Court will wait until receiving Plaintiff's response to this Order before ordering service on any of the named Defendants in this action.

3. Plaintiff's Motion to Appoint Counsel, (Doc. No. 4), is **DENIED**.

Signed: May 7, 2015

Frank D. Whitney
Chief United States District Judge