UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF N ORTH CAROLINA
STATESVILLE DIVISION
5:14-cv-186-FDW

| | |
|---|---|
| DAMON DEMOND STAFFORD, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>FNU MURRAY, et al., )<br>)<br>Defendants. )<br>_____) | **ORDER** |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants FNU Copeland, FNU Murray, and FNU Quigley. (Doc. No. 87).

## I. BACKGROUND

### A. Procedural Background

Pro se Plaintiff Damon Demond Stafford, a North Carolina inmate incarcerated at Scotland Correctional Institution in Laurinburg, North Carolina, filed this action on November 17, 2014, pursuant to 42 U.S.C. § 1983. He filed a verified Amended Complaint on June 1, 2015. In the Amended Complaint, Plaintiff alleges that he was subjected to excessive force on July 30, 2014, when he was incarcerated at Alexander Correctional Institution. Plaintiff originally named five Defendants, but all Defendants except for moving Defendants Copeland, Murray, and Quigley have been dismissed from the case.

Defendants filed the pending summary judgment motion on August 30, 2016. (Doc. No. 87). On August 31, 2016, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). (Doc. No. 91). Plaintiff filed a response to the summary judgment

1

motion on October 17, 2016.  (Doc. No. 95).

B. **Factual Background**

1. **Plaintiff's Allegations**

In his verified Amended Complaint, Plaintiff states that while he was housed at Alexander Correctional Institution ("Alexander"), on July 30, 2014, he was on a hunger strike and was found on the floor of his cell.  (Doc. No. 12 at 3).  While Plaintiff was taken by wheelchair to the main medical area, Defendants Murray and Copeland allegedly expressed frustration with inmates on hunger strikes.  (Id. at 5).  When they reached the main medical area, Defendant Quigley began to change Plaintiff's restraints.  (Id.).  Quigley placed handcuffs, shackles (leg irons), and a waist chain on Plaintiff and then instructed him to "turn his hands one over the other" so Quigley could secure Plaintiff's handcuffs to his waist chain.  (Id.).  Plaintiff refused and told Quigley that the black box could be applied the "normal" way.  (Id.).  Plaintiff claims that he was secured in that fashion just days earlier.  (Id.).

Murray then told Quigley to "twist his wrists" and grabbed Plaintiff's left wrist.  (Id.).  Quigley took hold of Plaintiff's left wrist and Copeland grabbed Plaintiff around the right side of the neck, choking him.  (Id. at 5-6).  Murray then ordered Copeland to flip over the wheelchair.  (Id. at 6).  Quigley and Murray "dove" on Plaintiff and Murray pushed Plaintiff's forehead with his arm, causing it to hit the floor and "split."  (Id.).  Murray instructed Copeland to "spray" him and then Plaintiff felt something hit the back of his head.  (Id.).  Plaintiff eventually complied and Quigley applied the black box to his handcuffs.  (Id.).  Captain Huneycutt arrived in the area and ordered statements to be taken.  (Id.).  Plaintiff was not taken to the hospital and photographs of Plaintiff were taken.  (Id. at 6-7).  Plaintiff claims that he injured his wrists, forehead, ear, and throat during the incident.  (Id. at 7).  Plaintiff also claims that Murray and Copeland were

2

involved in other "questionable" force incidents. (Id. at 8).

   2.   **Defendants' Summary Judgment Materials**

In support of the summary judgment motion, Defendants rely on all pleadings, discovery responses, and materials in the case record. Defendants also rely on the affidavit of Lane Huneycutt, with supporting materials, and the affidavit of Daren Bruce, with exhibits. See (Doc. No. 88: Huneycutt Aff.). In his affidavit, Huneycutt explains that he was the first-shift Captain and Officer-in-Charge ("OIC") at Alexander on July 30, 2014. (Id. at ¶ 4). On the date of the incident, Huneycutt was aware that Plaintiff was on a self-imposed hunger strike. Daren Bruce, former Assistant Superintendent of Operations at Alexander, explains that he was also at Alexander that day. (Doc. No. 89: Bruce Aff.). Plaintiff had been on a hunger strike to protest his placement in segregation due to a pending disciplinary investigation. See (Doc. No. 12 at 3). The investigation was the result of an incident on July 22, 2014, which resulted in disciplinary infractions for use of profane language and disobeying orders. A charge of actively rioting on July 22 was subsequently dismissed. (Doc. No. 89, Ex. A).

Bruce recounts that Plaintiff had been disruptive on the segregation unit that week and was transported to the hospital after being found "unresponsive" due to his hunger strike on July 26, 2014. (Doc. No. 89, Ex. B). Bruce reviewed and approved the incident report from the July 26 transport. (Id.). Bruce explains that when inmates are called "unresponsive" by prison staff, it is not meant to indicate a medical diagnosis of that inmate because officers are not trained medical professionals. (Doc. No. 89 at ¶¶ 7-9). Instead, it indicates that the inmate simply will not communicate with staff from inside the cell. (Id.). When officers make rounds, look in cells, and observe inmates, they try to communicate with the inmates. (Id.). If the inmates do not respond to the officers attempts to communicate with them, then they are deemed

3

"unresponsive," and staff begins a procedure to enter the cell and check the inmate's condition, which includes assembling a group of four or five staff members with a shield for their protection and a handheld video camera to record the entry to the cell, in the event force has to be used on the inmate because of their entry into the cell. (Id.). The officers also call a "Code Blue" to assemble correctional and medical staff at the cell. (Id.). If no force is used and the inmate is compliant when the officers enter the cell, the camera footage is not preserved because there was no force to document. (Id.). Further, when responding to the "Code Blue," medical staff at the cell is prepared for emergency because the medical condition of the inmate is not known before the officers enter the cell. (Id.). Thus, the presence of medical staff or medical equipment does not necessarily mean that the inmate requires some extensive medical treatment. (Id.). Bruce states that, in his twenty-six years of experience, he has learned that inmates often prefer to receive outside medical care because it allows them time out of their cell, in public, and, possibly, access to medical treatment, including medications, that they would have a more difficult time accessing in the prison. (Id. at ¶ 10). Unresponsiveness by an inmate will generate a response from medical staff and a possible transport for outside medical care. (Id.).

On July 30, 2014, around 2:25 pm, officers working in Alexander segregation unit checked on Plaintiff during rounds and, on surveillance footage, are seen standing outside of Plaintiff's cell, looking into the cell and trying to communicate with him. (Doc. No. 89 at ¶ 14; Ex. C). Officers radioed for backup, which arrived at approximately 2:26 pm. (Id. at ¶ 15). Staff came to the cell with a shield and a handheld camera. (Id. at ¶ 16). Bruce again explains that staff initially began to film their entry to the cell, but did not continue recording or preserve the footage because, based on Bruce's observation of the surveillance footage, it was apparent that staff were not going to have to use force to remove Plaintiff from his cell. (Id.).

4

The video shows that, at 2:27 pm, the officers have entered Plaintiff's cell and additional medical staff are seen arriving with a stretcher. (Id. at ¶ 17). Additional medical staff and medical equipment continue to arrive in the unit until 2:34 pm. (Id.). Both Murray and Copeland were working the segregation unit that day and were in the group of officers in the cell. (Id.). It does not appear that any force was used on Plaintiff whatsoever at this point. (Id. at ¶ 18). The officers appear to be talking, communicating, radioing, and even sitting inside of the cell and, according to Bruce, the officers appear fairly relaxed during the encounter. (Id.).

At 2:34 pm, medical staff begin to exit the unit, taking the emergency medical equipment with them. (Id. at ¶ 19). At 2:41 pm, medical staff exited the cell. According to Bruce, based on his experience, this indicates that medical staff had evaluated Plaintiff and concluded that his medical condition did not require the additional staff or medical equipment. (Id.). At 2:42 pm, staff arrive with a wheelchair while the officer in the cell are talking and gesturing. (Id. at ¶ 20). The officers begin to move around 2:45 pm, presumably around Plaintiff to secure him and then assist him to stand and sit in the wheelchair. (Id.). At 2:47 pm, officers exit the cell, pushing Plaintiff, who appears conscious and calm, in a wheelchair.[1] (Id. at ¶ 21). The officers, including Murray and Copeland, continue talking and do not appear angered or frustrated with Plaintiff. (Id.). They exit the unit and leave the view of the surveillance camera by 2:48 pm. (Id.).

After wheeling Plaintiff out of the unit, staff took him to the main medical area for

---

[1] According to Bruce, it is not uncommon for Segregation unit inmates to be escorted inside the facility in a wheelchair and is not necessarily indicative of any medical condition. Segregation inmates are required to wear leg irons, which slow their ability to walk. Officers use the wheelchair to assist the inmates and hasten the transport. (Doc. No. 89 at ¶ 22).

further evaluation and transport to the local hospital. (Id.). According to Huneycutt, once the officers arrived in the main medical area, Officer Quigley, a transport/receiving area officer, responded to prepare and secure Plaintiff for transport to the hospital. (Doc. No. 88 at ¶¶ 15-16). To do so, Quigley began to secure Plaintiff with "receiving" restraints and to remove the restraints from the segregation unit, as per NCDPS and Alexander policies.[2] (Id. at ¶ 16; Ex. B). Quigley provided Huneycutt a written statement which states that he first applied the receiving handcuffs to Plaintiff and then removed the segregation unit's handcuffs and waist chain. (Id. at ¶ 18; Ex. C at 13). According to Huneycutt, at that point, Plaintiff would have been seated in the wheelchair but only secured with leg irons and handcuffs. (Doc. No. 88 at ¶ 18; Ex. C at 16). This is not considered "fully restrained." (Doc. No. 88, Ex. B at 7, 26, 33; Ex. C at 16). And, it would allow Plaintiff a full range of motion with the handcuffs and the means and opportunity to assault staff or evade their attempts to restrain him. (Doc. No. 88 at ¶ 18; Ex. C at 16).

To secure Plaintiff's black box, Quigley instructed Plaintiff to place his hands close to his waist, palms down and crossing at his wrists, but Plaintiff refused. (Doc. No. 88 at ¶ 19; Ex. C at 13). Copeland and Murray were standing next to Plaintiff and heard him tell Quigley, "I don't have to put my hands like that." (Doc. No. 88, Ex. C at 10, 11). Quigley then told Plaintiff that he was restraining him according to policy and again ordered him to submit to the restraints. (Id.). Plaintiff again refused. (Id.). At that point, Sergeant Beal (Quigley's supervisor) told Plaintiff that Quigley was correct and ordered him to submit to the restraints. (Doc. No. 88 at ¶ 20; Ex. C at 17). Murray (Copeland's supervisor) also ordered Plaintiff to submit to the

---

[2] According to Huneycutt, when inmates are transported out of the facility, they are secured with restraints from the receiving area, which not only helps staff account for the account for the restraints, it also allows the inmates to be placed in additional restraints, like the "black box" at issue here. (Doc. No. 88 at ¶ 17; Ex. B).

6

restraints and he refused. (Id.; Ex. C at 10).

Plaintiff pulled his hands to his chest to avoid having them restrained to his waist. (Id. at ¶ 21). At the direction of the supervising officers, Quigley and Copeland attempted to place Plaintiff's wrists in the correct position so they could apply the black box. (Id.). As Copeland and Quigley were touching Plaintiff's wrists, he grabbed at Copeland's left hand and tried to bite Quigley. (Id. at ¶ 22; Ex. C at 10, 11, 13). Murray, seeing that Plaintiff was aggressive with the officers, ordered Copeland to administer OC (pepper) spray to Plaintiff. (Id. at ¶ 23; Ex. C at 10, 16). Plaintiff was continually being ordered to comply with orders during this time. (Id.).

Copeland gave a short burst of OC spray to Plaintiff's facial area, which, according to Copeland and Quigley, caused Plaintiff to become more agitated and aggressive. (Id. at ¶ 24; Ex. C at 11, 13). The OC spray was administered in compliance with policies regarding its use. (Id., Ex. C at 16). Plaintiff's level of resistance increased and Copeland and Quigley (at their supervisor's direction) placed Plaintiff on the floor try to restrain him and stop him from assaulting them. (Id. at ¶ 25; Ex. C. at 16). The increasingly volatile situation required additional force to match the threat posed by Plaintiff. (Id.). Huneycutt states that, in his twenty-one years of experience, it is not uncommon for OC (or pepper) spray to only agitate aggressive inmates. (Id.). Staff were presenting with an unruly, combative and assaultive inmate whose level of agitation was increasing and who was not fully restrained. (Id.).

Once Plaintiff was on the floor, Murray used approved pressure point restraint techniques to try to gain Plaintiff's compliance. (Id. at ¶ 26; Ex. C at 10, 16). Huneycutt states that Murray's actions complied with prison policies and were only taken in efforts to gain Plaintiff's compliance. (Id.). Staff denied "flipping" Plaintiff out of the wheelchair, hitting him in the head, choking him, or hitting him with the OC canister. (Id. at ¶ 27; Ex. C at 10-14, 16).

7

Huneycutt arrived in the main medical area after it was reported that Plaintiff had become disruptive and combative with staff. (Id. at ¶ 28). When Huneycutt encountered Plaintiff, he was standing and beginning to be compliant with the officers. (Id.). Huneycutt observed a small scratch or cut on Plaintiff's forehead, but otherwise noted that he appeared to be without injury. (Id. at ¶ 29). Huneycutt photographed Plaintiff despite Plaintiff's protest and resistance. (Id.). Huneycutt initiated the incident investigation and ordered staff who were involved in or witnesses to the use of force to complete witness statements. (Id. at ¶ 30). Huneycutt also began to substitute other officers to supervise, escort, and accompany Plaintiff as replacements for the officers involved in the use of force, as policy requires. (Id.). Medical staff evaluated Plaintiff and determined that there was no longer a medical need to transport Plaintiff to the hospital. (Id. at ¶ 31). Medical staff cleared Plaintiff to return to his cell after decontamination from the OC spray. (Id.). Plaintiff was decontaminated with a shower, given a change of clothes, and returned to his cell. (Id.). During the investigation, Huneycutt determined that there was not surveillance footage of the actual use of force incident because there are not surveillance cameras in the main medical area. (Id. at ¶ 34). Also, the use of force was unanticipated and therefore was not being recorded on handheld video camera. (Id.). Bruce explains that, during Plaintiff's disciplinary investigation and at Plaintiff's request, the surveillance video footage from the segregation unit when Plaintiff was removed from his cell was preserved. (Doc. No. 89 at ¶¶ 25-27). However, that footage does not capture the use of force and depicts Plaintiff appearing to comply with the officers. (Id.; Ex. C).

Plaintiff was found guilty of disobeying orders and attempting to assault staff in connection with this incident. (Doc. No. 89, Ex. D). Plaintiff's infractions were upheld on appeal. (Id.). Huneycutt concluded that the amount of force used by staff (the OC spray and

8

hands on force) were necessary and appropriate to stop Plaintiff's combative and assaultive behavior and to restrain him. (Doc. No. 88 at ¶ 35). Huneycutt's report and conclusions were reviewed and approved by another Captain (Watkins), Assistant Superintendent Bruce, Administrator White, and Region Director Pinion who all concurred with his determination. (Id.; Doc. No. 89 at ¶ 18). Both Bruce and Huneycutt aver that Plaintiff's claims are without merit. (Doc. No. 88 at ¶ 39; Doc. No. 89 at ¶ 32). Plaintiff complained to Western Region Director Todd Pinion regarding the incident, but Pinion informed Plaintiff that the incident was investigated and the force used was appropriate. (Doc. No. 89, Ex. E).

In support of the summary judgment motion, Defendants submit their verified interrogatory responses, which were provided in response to Plaintiff's discovery responses. In his interrogatory responses, Defendant Copeland states that he did not use profanity towards Plaintiff nor did he threaten him with a feeding tube. (Doc. No. 90-1 at ¶¶ 3, 7: Copeland Responses, Ex. A). Copeland also states that he was standing approximately three feet from Plaintiff when he administered pepper spray. (Id. at ¶ 4). In his responses, Quigley states that, during the encounter, Plaintiff grabbed him, twisted his fingers, and attempted to bite him.3 (Doc. No. 90-2 at ¶¶ 11, 14: Quigley Responses, Ex. B). Quigley also states that Plaintiff was not fully restrained and was attempting to stand from the wheelchair when pepper spray was administered. (Id. at ¶¶ 5, 9). Murray states, in his responses, that he ordered the staff members to attempt to restrain Plaintiff and then to use pepper spray to gain Plaintiff's compliance and stop his assault. (Doc. No. 90-3 at ¶ 3: Murray Responses, Ex. C). Murray states that he used

---

3 In support of summary judgment, Defendants also offer Plaintiff's grievance about the July 30, 2014, and Quigley's statement in response to the grievance, in which Quigley details that he could feel that Plaintiff's mouth was touching him and open and that he could feel Plaintiff's teeth. (Doc. No. 45-2 at 10).

9

the pressure point technique to stop Plaintiff's aggressive behavior. (Id. at ¶ 7).

Finally, as to Plaintiff's medical records injuries as a result of the incident, Defendants state that Plaintiff first expressed that he was on a "hunger strike" to medical staff on July 23. (Doc. No. 90-4 at 32: Medical Records, Ex. D). Plaintiff was informed by medical staff about the dangers of refusing meals on that day and the following days and encouraged to eat and to remain hydrated. (Id. at 12-32). Medical staff began conducting daily "hunger strike assessment[s]" of Plaintiff and mental health professionals visited him. (Id.). On July 26, Plaintiff first reported that he was "good" to medical staff during his daily assessment, but later would not respond to medical staff when they visited his cell to assess him. (Id. at 24-28). The hospital diagnosed Plaintiff as dehydrated and mildly hypoglycemic. (Id. at 8-10). Plaintiff began refusing medical evaluation and treatment on July 28, which continued through July 30. (Id. at 2-7). On July 30, Plaintiff was medically assessed after the "Code Blue" and was determined to be alert and oriented. (Id. at 15, 17). Plaintiff refused fluids. (Id.). After the use of force, Plaintiff was assessed and no bruising, lacerations, or grimace during movement were seen. (Id. at 16). Staff noted a small abrasion on his forehead. (Id.). Plaintiff was given an antibiotic ointment and instructed to wash the infected area with warm soap and water. (Id.). The following day, Plaintiff was without medical complaint and told staff he was on hunger strike because he believed his food tray was tampered with. (Id. at 12-14).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential

11

element of his claim.

## III. DISCUSSION

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312, 319 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). In adjudicating an excessive force claim, the Court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury inflicted, and, ultimately, whether the force was "applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." Albers, 475 U.S. at 320-21. Furthermore, although the lack of serious injury may be considered a factor in the excessive force analysis, the fact that the prisoner suffered only minor injuries is not dispositive in an excessive force claim. See Wilkins v. Gaddy, 559 U.S. 34, 38 (2010).

The Court denies Defendants' motion for summary judgment as to Plaintiff's excessive force claim. In support of their summary judgment motion, Defendants submit incident reports, witness statements, and the affidavit of Defendants Huneycutt and Bruce, who were not present when the incident occurred, in which they both opine as a legal conclusion that excessive force was not used. First, an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4) (emphasis added). Huneycutt and Bruce were not present when the incident occurred. Thus, their

statements as to what happened during the alleged incident are not based on their personal knowledge and are therefore inadmissible hearsay. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory or based upon hearsay.") (citations omitted).

The Court further observes that, as to any legal conclusions made with regard to use of force, such as the legal conclusion that Defendants did not use excessive force against Plaintiff, those legal conclusions are also not admissible on summary judgment. See United States v. Perkins, 470 F.3d 150, 157 (4th Cir. 2006) (where an arrestee alleged that officers used excessive force, the testimony of the investigating officers who were not present when the incident occurred, and who testified as to the reasonableness of the officer who used the force, did not satisfy the personal knowledge requirement for the admissibility of lay opinion testimony); Parker v. Butler, No. 7:12-CV-03503-RDP, 2014 WL 3566516, at 6 n.3 (N.D. Ala. July 18, 2014) ("Whether or not one of the Defendants violated Plaintiff's right to be free from excessive force is a legal conclusion outside the purview of admissible testimony from either a lay or expert witness.").

Next, as to the unsworn incident reports and witness statements submitted by the other officers to support Defendants' summary judgment motion as to Plaintiff's excessive force claim, none of these individuals has submitted an affidavit in support of summary judgment. See Adams v. Bouchard, 591 F. Supp. 2d 1191, 1204 (W.D. Okla. 2008) ("Critically absent from Defendants' summary judgment record is an affidavit or declaration made under penalty of perjury from either [of the two defendants alleged to have used excessive force against the plaintiff]."). Moreover, the incident reports are not admissible because they are based on

13

hearsay.[4] See Bracey v. Herringa, 466 F.2d 702, 705 (7th Cir. 1972) ("We conclude that it was error for the district court to accept in support of the defendants' motion for summary judgment prison records which included the self-serving statements of the defendants themselves as well as statements of other prison guards."); see also Pommer v. Vaughn, No. 3:07cv537, 2009 WL 1490570, at *2 (D. Conn. May 27, 2009) ("[C]ourts examining incident reports in excessive force cases have found such reports to be inadmissible under Rule 803(6) because they are self-serving and lack indicia of reliability."); Mahone v. Pierce Cnty., No. C14-5665 BHS-KLS, 2015 WL 9311608, at *2 (W.D. Wash. Nov. 20, 2015), report and recommendation adopted, No. C14-5665 BHS-KLS, 2015 WL 9303485 (W.D. Wash. Dec. 22, 2015) ("The Court cannot consider the content of the incident reports because the affidavit submitted is not made on the personal knowledge of an affiant who is competent to testify to the matters stated therein. See FED. R. CIV. P. 56(e). Here, defense counsel can attest that the reports exist and that the copies presented are true and correct copies, but he is not competent to testify as to the content of the unsworn reports."); Kokoska v. City of Hartford, No. 3:12-CV-01111 WIG, 2014 WL 4724875, at *3 (D. Conn. Sept. 23, 2014) ("Recognizing the potential for self-serving statements by officers involved in excessive force incidents, courts in this circuit have generally found that their incident reports were inadmissible under Rule 803(6) because of the lack of indicia of reliability.").

The Court further notes that the Amended Complaint itself is verified. A verified complaint "is the equivalent of an opposing affidavit for summary judgment purposes, when the

---

[4] The Court has considered the sworn interrogatory responses of Defendants in considering Defendants' summary judgment motion. As the Court explains, however, Plaintiff has presented enough evidence to withstand summary judgment, given that the Court is required to construe the evidence in the light most favorable to Plaintiff.

14

allegations contained therein are based on personal knowledge." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (citing Davis v. Zahradnick, 600 F.2d 458, 459-60 (4th Cir. 1979) (summary judgment was improper where the inmate plaintiff alleged in a verified complaint that a prison guard watched a fellow inmate assault the plaintiff and did not intervene to stop the assault, despite conflicting affidavits from the prison guard and others)). The allegations in Plaintiff's verified Complaint, as recited supra, are enough to raise a genuine issue of material fact as to whether Defendants used excessive force against Plaintiff. See Duff v. Potter, No. 16-6783, 2016 WL 6518876, at *2 (4th Cir. Nov. 3, 2016) (reversing this Court's grant of summary judgment to the defendants on the plaintiff's excessive force claim, finding that "[Plaintiff's] version of events in his verified complaint is significantly different from the Defendants' version. Although the Defendants submitted affidavits and support for the motion for summary judgment, the court may not consider these materials in a vacuum. The court must view the facts and inferences drawn from the facts in [Plaintiff's] favor.").

In addition to the allegations in the verified Complaint, in opposing Defendants' summary judgment motion, Plaintiff has submitted a sworn declaration, in which he alleges the following facts related to the excessive force incident:

> Defendants Murray and Copeland, who both worked segregation, escorted me to main medical instead of receiving. Copeland pushed the wheelchair while Murray walked along side of it. Along the way the two Defendants "discussed their frustration with all the extra work they were having to do, because of the numerous prisoners who were on hunger strikes at the time." Defendant Murray told Copeland of his desire to start force feeding tubes down prisoners' throats, and stated, "I bet that'll slow this shit down." Defendant Copeland laughed and told Murray, "That's what's about to happen to this one," then proceed to tell Murray he had witnessed a prisoner pull one of the feeding tubes out of their throats."
> In main medical I was wheeled into the open left hand cubby spot that views the whole medical area, and also the waiting area for prisoners who are coming to or leaving medical at Alexander Corr. Inst. Defendant Quigley was

15

waiting there alone, with restraints to change out. He changed the shackles, handcuffs, then told me to flip my wrist one over the other one, so the back box could be applied.

       I told Quigley that wasn't policy and the black box could be secured the normal way because I had been to the hospital days earlier. At that time Defendant Murray, who was a higher-ranking officer than the other Defendant, said "Fuck this shit," while ordering the Defendants to twist his wrists."

       From the point, while I sat handcuffed and shackled in a wheelchair Defendant Copeland proceeded to choke me by grabbing me around the throat and squeezing, as Defendants Murray and Quigley tried to twist my wrists. I pulled my hands into my stomach while telling them to stop, it was my attempt to stop them from continuing to hurt me.

       Not being able to twist my wrists, Defendant Murray told Copeland to flip the wheelchair. Being handcuffed and shackled along with being physically weak, I had no chance of bracing my fall. When I hit the floor Murray dove on top of me with his forearm into my head driving it into the floor which bursted [sic] on impact with the floor leaving a 3 to 4 inch gash across the top of my forehead.

       Defendants Quigley and Copeland was pulling on my handcuffed wrists, which left numerous cuts and sears, until Murray said, "Spray his ass!" and Copeland sprayed me in the face with the mace can from his hip. Seconds later I felt something hard smash into the back of my head. And as they kept pulling and twisting me other officers were arriving, a lady sergeant lifted my feet up by the shackles. Defendant Murray started telling the other officers they need the "bog can" of mace. I started shouting "okay" and they stopped and twisted my wrist and applied the black box.

       Former Defendant Huneycutt came asked if I was in restraints when force was used. Sgt. Walker was taking pictures of my injuries when Huneycutt was told I was restrained in a wheelchair when force was used he told everyone who was involved to go make a statement and make it good.

       EMS officials arrived immediately after the photos were taken and after a brief conversation between Honeycutt, who was the OIC, and N.P. Guinn ensued, before it was determined that I would not be going to the emergency room.

       I was wheeled back to segregation without being examined for dehydration, which N.P. Guinn originally diagnosed me with a determined I needed emergency medical attention, or the injuries [sustained] at the hands of the Defendants.

       However, hours later a male nurse came to the cell door (SC-3) asked me questions about the incident and gave me some ointment and [band aids] for my forehead. . . .

       I was seen numerous times on sick call about a throat problem that persisted for months, which caused me to spit up thick greenish brown phlegm and have long bouts of coughing. I also had an intense ringing in my right ear that cause headaches. This lasted for more than six months and N.D. Guinn prescribe two different types of medication for this.

> At no time did I try to assault these Defendant[s] not refuse the black box as my statement in the Amended Complaint states I told Defendant Quigley "he could" apply the handcuffs the normal way. I had never been handcuffed like that in my 17 years of incarceration and that was my way of showing Quigley my willingness to cooperate with him.
> Nobody said nothing to me before force was used on me. And as the picture taken as recently as September 2, 2016, at Scotland Corr. Inst., will show the scar [sustained] two years ago at the hands of Defendants at the crease of my forehead. ….
> The force used against me was needless and overly excessive by the Defendants on July 30, 2014 and I have been scarred for life physically and mentally from this.

(Doc. No. 95-1 at 1-6). This additional evidence submitted by Plaintiff, when considered in conjunction with the allegations made in his verified Complaint, is sufficient to raise a genuine issue of material dispute as to whether Defendants used excessive force against Plaintiff.

Finally, it appears that the parties' have offered conflicting evidence about the extent of Plaintiff's injuries. Although Defendants contend that Plaintiff's injuries amount to only a small scratch on his forehead, Plaintiff contends that he has a scar on his forehead as a result of the incident, and that he suffered from an intense ringing in his right ear and headaches for at least six months after the incident. Although the lack of serious injury may be considered a factor in the excessive force analysis, the fact that the prisoner suffered only minor injuries is not dispositive in an excessive force claim. See Wilkins v. Gaddy, 559 U.S. 34, 38 (2010). The Court finds that Plaintiff has presented enough evidence to raise a genuine issue of dispute as to the extent of his injuries as a result of the use of force against him.

In sum, considering all of this evidence presented by Plaintiff on summary judgment, and construing all inferences in the light most favorably to him, the Court finds that Plaintiff has submitted enough evidence on summary judgment to withstand the motion by Defendants. The

Court notes that Defendants also raise qualified immunity as a defense to Plaintiff's claim for monetary damages. In considering qualified immunity on summary judgment, the Court takes as true Plaintiff's allegations and construes them in the light most favorable to Plaintiff. See Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008). "[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." Vathekan v. Prince George's Cnty., 154 F.3d 173, 180 (4th Cir. 1998). The Court finds that Defendants are not entitled to qualified immunity. In conclusion, because there is a genuine issue of material fact as to whether Defendants used excessive force against Plaintiff, Defendants' summary judgment motion is denied.

## IV. CONCLUSION

For the reasons stated herein, Defendants' summary judgment motion is denied.[5]

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 87), is **DENIED**.

Signed: February 6, 2017

Frank D. Whitney
Chief United States District Judge

---

[5] The Court, therefore, will make inquiry into appointing counsel for Plaintiff at this stage in the proceedings.